I represent the plaintiffs' appellants in this case this afternoon. This is a really important case in my judgment. It's a First Amendment case. And the plaintiffs contend that they were denied a permit or license to run a charter school in Lafayette because the superintendent, Mr. White, was ticked off at the end basically because Dr. Clarkston had gone on a national TV show and discussed her views about spanking children. Apparently Mr. White got all exercise about it and was the moving force in denying this charter school application. After it had gone through an approval process, it had glowing scores. Basically what I wanted to do, I want to start out, if you don't mind with an introduction to my argument, from the Rosenberger case, Rosenberger v. Rector and Visitors of the University of Virginia. Citation is in my Rule 28J supplement. And the Supreme Court said in that case in 1995, when the government targets the particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. And then the court goes on to say this prohibition is so well established to be axiomatic. Then the court goes on to say viewpoint discrimination is thus an egregious form of content discrimination, which is exactly what we have here. These actions were taken because John White was upset about her views on corporal punishment of her own children. Now, part of this case is pretty simple. This court lays out the law very clearly in Keenan v. Cajada. This is not an employee's speech case. This is a private, ordinary citizen's speech case. The elements of this case are, number one, the plaintiff's engaged in constitutionally protected activity. That's been admitted by the defendant throughout this proceeding. Number two, that the plaintiff's action caused the plaintiff to suffer injury that would chill or dissuade a person from ordinary firmness or from continuing to engage in that activity. And number three, the plaintiff's adverse actions were substantially motivated by the exercise of constitutionally protected conduct. You all remember the Mount Healthy case decided by the Supreme Court several years ago. And that's a First Amendment case. That basically is the contours of this case. The second element of this case, which I will discuss briefly, is causation. The district court seemed to believe that because the BC Board, it's the Board of Elementary and Secondary Education in Louisiana, had the final approval, say so, on this charter school application, that automatically, mechanically cut off any causation. The court didn't say that exactly. That's my sort of paraphrasing analysis of it. But that is really not the law, and I think that's legal error. You ought to remember the Staub v. Proctor Hospital case, which dealt with just that issue in a Title VII case, where you have a neutral final decision maker but a biased supervisor who is a motivating force in the denial of the Title VII rights. And that seems to me that analysis undercuts the idea that a formal approval automatically cuts off any causation. Malley v. Briggs is another case on that. And that's where the officer presented an invalid search warrant affidavit to the judge. The defense was that, well, the judge signed it, so the officer can't be liable for that, and the Supreme Court held no, that's not the causation standard. And I might add in this, I was referring to Mount Healthy earlier, that's a motivating factor analysis, and that is still, despite the but-for trend of the Supreme Court, that is still the standard that applies in this case. Next element, dissuade a person of ordinary firmness. This denialist application, these people had worked on this thing for years. They had a very, very good board of outstanding people in the community, spent a lot of money. It was a pretty important project for them. They lost a lot of money in the future. It's difficult to see, I respectfully submit, how a reasonable person applying for a charter school application would not be dissuaded or chilled if they knew that exercising free speech would result in the denial of that application. But your problem is, this is a qualified immunity appeal, and it was not clearly established as of March of 2016 that a non-final decision-maker could be liable for retaliation for just making a harmful recommendation to the final decision-making authority. So there was an easy part of this case, there was a hard part of this case. That's the hard part. That's the hard part, it seems to me. That's the hard part. Tell us how it was that the law was clearly established then. The law was clearly established in Jett v. Dallas Independent School District in 1986. The facts were very, very similar. You had a principal, a man named Todd, who was not the final decision-maker, but that did not relieve him of liability according to this court. Todd was also not protected according to this court by qualified immunity because he violated Jett's constitutional rights, and those rights were clearly established at the time of the recommendation. Same thing here. Exactly the same thing here. That was 1986. And we contend, Your Honor, that under this court's well-established rule of orderliness, that that is the controlling precedent. Of course, a further backdrop to that, I mean, it's been established for 50 years when the Pickering case was decided by the U.S. Supreme Court that retaliation by taking adverse action against an employer or citizen violates the First Amendment. Now, what complicates this is the series of decisions that were set aside by this court after Jett. And the Sims v. City of Madisonville decision is really something that y'all really need to dig into and clarify the law, because those of us who work in the trenches have a hard time following these things sometimes, and for the poor people who are innocent and deprived of a lot of money, First Amendment violations, I think, deserve some clarity. Sims is a case that involved municipal liability. This is not a municipal liability case. This is a state executive official case. And so we contend that the municipal liability rules should not apply in this case for several reasons. Number one, qualified immunity doesn't apply with state executive officials. And number two, municipal liability involves that whole penumbra of Monell issues and who is a policymaker and who is not a policymaker. It is just a test that should not be applied in this particular case, where you're dealing with private citizen speech or you're dealing with state executive officers, not municipalities. This also, Sims was a public employee case. And, you know, I've got a whole different set of factors in a public employee's case, because you have the rights of the employer in maintaining discipline and supervising and controlling their workforce that leads to more of a balancing test like the Garcetti versus Sevelos test. You don't have any of that here. This is not a public employee case. And you also have the fact that in this case there is viewpoint discrimination. It's just obvious that this action was taken because White was ticked off about talking about spanking your children. And Sims did not involve viewpoint discrimination. And that's a very strong distinguishing factor in my judgment. There's a case decided by this court in 2001, Chiu versus Plano Independent School District, and it says, and I quote, this court in 2001, it is settled that viewpoint discrimination is a clearly established violation of the First Amendment in any form. And that's what this court said. And, you know, to me that takes it out of the analysis of municipal liability. Viewpoint discrimination is, I believe, a separate subset of First Amendment retaliation. And it's just not a situation where you can have qualified immunity. Viewpoint discrimination and qualified immunity just don't go hand in hand because these are well-settled principles. Now, I think you also have to look at, Judge Smith, the fact that we have some difference in rights here. We have the First Amendment, which is, you know, it's sophomoric to say it's one of the most fundamental rights of our nation, of our citizens. We fought the Revolutionary War to guarantee these rights. There's nothing more important than First Amendment rights. The Supreme Court has consistently supported that view. It's not like a situation where you've got a police officer in the heat of battle with a suspect. I mean, those involve snap decisions on the spot where people's lives are in danger. And the Constitution right in that case is a vague thing called the due process law. I think that's where excessive force comes from. We have a much more specific right here in the First Amendment. People know that you can't take action against somebody for expressing their opinions. It's basic to our society. It's interesting to note that the Louisiana Constitution, Article 1, Section 7, in Clause 2, is even more specific than the First Amendment, because it says every person shall have the right to express their views on whatever subject. That's not the exact language, but that's kind of a paraphrase. It's kind of like the case in which a Fourth Amendment case came to the U.S. Supreme Court, Brasso v. Hoggar. It basically said that a law enforcement officer presented an affidavit to a magistrate that wasn't particularized for a search warrant. And so they claimed that, well, it ought to have qualified immunity because this one didn't have a specific case on point or on all fours. And the court said, no, someone, a reasonable public official can look at the Fourth Amendment. It says particularized assertions of probable cause. I think it's similar to the First Amendment. I mean, you have to deal with the right that's in question here, particularly the right against viewpoint discrimination. I'd like to also state that there's another case I think that's important in the analysis. It's the Hope v. Pelser case. You'll probably remember where the prison officials hitched this prisoner to a hitching post or something, and the Supreme Court held that you don't need a specific case saying that prison officials can't hitch somebody to a hitching post without giving them food and water and breaks and stuff like that. The court said, and I quote, officials can still be on notice that their conduct violates established law, even in novel factual circumstances. And the court continues, Hope v. Pelser held that where a constitutional violation was obvious, then there need not be a materially similar case for the right to be clearly established. And I just love Judge Pollitt's recitation of what a similar case is. I saw it in my brief. He talks about you don't have to have what's called a goose case in Louisiana, and he talks about that similar formulation in other states. You don't have to have a case specifically on point, and particularly where the violation is obvious. That's what we see of this case. We believe that the case is entitled a trial. It came up on a motion for summary judgment. We ask the court to reverse and remand. We'd be happy to answer any further questions. If you could save time for rebuttal, thank you. Yes, Your Honor. Thank you. Walters. Thank you. Good afternoon, Your Honors. May it please the court, Christopher Walters on behalf of the appellee, Superintendent of Education John White. We would like to first go back and kind of refocus the case on the relevant issues here. The most important being that Superintendent John White is merely an advisory capacity in an advisory role to the BESSE board, the Board of Elementary and Secondary Education, that makes the ultimate decisions on whether or not to approve or deny a charter application. As the district court correctly pointed out, Superintendent White gets no vote on the board of BESSE as to any charter application. It is merely an advisory role that provides information and a recommendation regarding the department's stance as to the charter application. A couple of very important things to note in this case. First, this charter application was denied at the local level by the Lafayette Parish School Board. Before it ever got to the department, got to Superintendent White or to the BESSE board, they had already been denied once. Now the law provides an avenue for appeal, to appeal to the BESSE board, and they took that decision and went up with it. The next thing that happened is that an independent reviewer, a third-party reviewer named School Works, which is contracted by the department at the direction of the BESSE board, does a full evaluation of the charter application. It has a long list of criteria that you have to meet, that you have to go through, the funding, the budgets, the school calendars, and all those types of things. However, as Superintendent White pointed out, the School Works independent evaluation had no line in the rubric regarding outside activities that may bear upon the suitability of a charter applicant or the school leader for a charter applicant, such as in this case. With respect to Defendant White, he testified in his deposition that it was not the statements about corporal punishment that he was concerned with. His concern was about the airing of personal disciplinary actions with regards to minor children on a national television show, in a reality television show, and airing the discipline of the children. Superintendent White said that he was concerned of the effects on the children of what this national attention may do to a child that sees himself on television and is being disciplined in front of the whole world. And so it's not simply just this idea of corporal punishment, it's the judgment to agree to take your family and take your minor children. I thought there was at least conflicting evidence on that point. As far as Superintendent White's concerns go, he stated clearly in his deposition at... I thought there was other evidence in the record that he also, at one point in time, took the position that just her view on corporal punishment was problematic. I think that was brought up during a telephone conversation between Superintendent White and the plaintiff, and I believe the Board of Directors for the Kingdom, the Kingdom Builders' Charter that they were a part of, and that was something that was brought up during the telephone conversation. He said that, and I can't remember the actual language, something about her views on corporal punishment, but he clarified in his deposition that that was specifically directed towards the judgment and leadership and what that says about whether or not she should be entrusted with children from across the state. I just want to be very clear about this. Is it your position that the state or a state entity cannot consider a person's view on corporal punishment in deciding whether they are suitable to run a charter school for elementary or secondary? Oh, we don't believe that at all. In fact, Superintendent White specifically said that this – her involvement in this – the plaintiff's involvement in this program raised concerns to him that he wanted to further review and address, and I think that's what you're getting to is that... Why are you making such a big deal about – oh, no, it was just the fact that she was discussing minor children being disciplined on national television in a reality show. I mean, why is – it seems like you were taking great pains to say, oh, no, it doesn't have anything to do with her view on corporal punishment. Now you're saying, yes, it does, and I'm confused about that. It is to the extent that those views are acted out in a setting where they are actually enforced on her children and enforced in a way in which the children might be affected by that and her judgment in the plaintiff's deposition of saying that she did not have control of how the narrative was going to be presented in this television program. And yet she still allowed her children to be shown on the television program and be shown being disciplined and their bad behavior. And so I think, yes, I think corporal punishment is a – something that the Bessie board can consider with regard to an applicant's stance or position on that issue, and in fact – So you did not concede that there was – that there could conceivably have been a First Amendment retaliation here? Do you concede that or not? They say you had. That there has been retaliation here? Based on – in violation of someone's First Amendment rights. I don't believe that to be the case. I think she has a right to speech and a right to speak her opinions. But y'all aren't – you don't seem to brief that issue in your brief. You don't say, well, the case law isn't clear that this would be a viable ground for not choosing her, or this would not be a viable ground for – you would have to overlook this entirely. You don't seem to brief that issue. I understand, Your Honor. To the extent we haven't briefed it, we can simply rest on what we said here today and say that for your purposes for this case, it's not really relevant because the relevant issue in this case is whether or not the plaintiff's claims are foreclosed by the Sims v. City of Madison case that plaintiff's counsel cited earlier. In that case, which I believe Judge Didis, you were a part of, the court specifically went through the case law regarding a non-final decision-maker's liability for First Amendment retaliation. It went through and touched on the case of Jett. It touched on the case of Johnson v. Louisiana. And in doing so, it explained how the law came to be and how the law came to be muddled up after Jett and intervening opinions from this court in which the issue was made unclear by post-Jett opinions that have said that a non-final decision-maker – a non-final decision-maker has a right to speech. A non-final decision-maker cannot be liable for First Amendment retaliation, especially in the context of simply making a recommendation to the board who ultimately will make that decision. And the court in Sims specifically held that if judges have mixed up principles of individual and municipal liability in this area and failed to recognize Jett as the controlling decision, law enforcement officials should not be expected to have a more nuanced understanding of Section 1983 law. And, of course, as you all know, the qualified immunity analysis is quite common. First, there's got to be a determination of whether or not the plaintiff has proven a violation of constitutional rights. And secondly, the question becomes whether the actions and conduct of the officials at issue in this case were – whether the law was clearly established that what they were doing was unconstitutional and would subject them to liability. And the Sims court clearly held that the law in this area was unclear until it handed down this opinion on June the 28th of 2018 and such that before that time, the law was sufficiently unclear such that an official would be entitled to qualified immunity because the law was not clearly established at that time. Just so it was with Mr. Covington in the Sims v. City of Madisonville case, the individual so it is here with Superintendent White, that regardless of the determination of the first prong as to whether or not a constitutional violation was actually proven, the underlying clearly established law was not clearly established at that time. Going back – going back to two of our other arguments that we have raised in brief, there are two additional avenues, if you will, in which you can uphold the district court's ruling even if on alternative grounds. We've raised the issue of sovereign immunity. The plaintiff contests that he has named Superintendent White in his individual capacity and therefore he can get around the sovereign immunity issues within 1983. The problem with that is his – the plaintiff's claims in this case are strictly about what Superintendent White did in his official capacity as the head of the Department of Education and making a recommendation to the board. There is no allegation as we understand it that Secretary – that Superintendent White exceeded his authority in making the recommendation or in any manner of that such, so – which would mean that this is simply an official capacity claim attempting to be characterized as an individual capacity claim. Setting that issue aside, we've also raised the issue of absolute quasi-judicial immunity. This is another instance in which the Bessie Board is an independent board that makes regulatory and important decisions on education in the state of Louisiana for all elementary and secondary education. It is extremely important that the board and the members and the individuals that come before the board have protection from harassment and retaliation and claim – and lawsuits because of information that is shared with the board and decisions that are made by the board. In each of these board meetings in which the plaintiff or the kingdom builders was involved, they had ample opportunity to speak to the concerns, speak to the board members, address those concerns. And, in fact, in the plaintiff's deposition at Record on Appeal 510, the plaintiff herself admits that she gave them, the Bessie members, the link to watch the video from this America's Supernanny show. She gave them the link and suggested that they go watch it and asked them to go watch it. And so it is very difficult for us to understand how her suggesting to the Bessie members to go watch the video and make a decision for themselves has now imputed that this was all the responsibility and all of the harm was caused by Superintendent White. Would she herself encourage them to go view the video and make a decision for themselves as to the underlying issues and whether or not they believe that she is qualified and proper to be a charter applicant, the leader of a school there? And if Your Honor, if you don't have any other questions, I will cede the remainder of my time. Thank you, Mr. Walters. Mr. Smith for rebuttal. The bottom line in this case is that Jett was decided in 1986. Jett said, this court said, that the law is clearly established. The fact that you have another formal level of approval doesn't negate the liability of the person who is a motivating force, who is a driving force. And you have all this, you have a number of cases after that, and it's recognized in this court's decisions in Sims and Culbertson how conflicting and confusing this jurisprudence is from this court. And I mean no criticism. I have the greatest, hugest respect for this court. But this jurisprudence is messed up. The rule of orderliness should apply. You all just did that in the EEOC Title VII case when you said that filing within 180 days before EEOC determination is not jurisdictional. You relied on the rule of orderliness, and that's the correct approach. Those cases after Jett are of no effect under the rule of orderliness. And I think this court should either apply the rule of orderliness, as it's done in other contexts, or the problem in Sims, Sims says, well, we're going to try to straighten out this jurisprudence. But the poor plaintiff in Sims says he can't recover because our straightening it out happened after the man was, his constitutional rights were violated. So it needs to go back to the rule of orderliness, or it needs to go en banc to establish whether the Jett decision actually controls. And I know you all don't want to modify the decision of another panel, and that may be what happens here. But this is a case where White was the driving force, the motivating force. I asked White in his deposition, can you tell me one standard of criteria that the applicants in this case didn't meet, except for the business about her expressing her views about corporal punishment. And he hemmed and hawed, and you read the deposition, it's in the record, hemmed and hawed and evaded and this and that. And basically he said, no, he said, I did this on a holistic basis. I said, well, where's holistic basis in your regulations? Well, he couldn't answer that either. And they talk about judgment and maturity. But go back and look at the second report of this transcendent legal that White commissioned for this case. Never talked, never contracted with him before or since, according to his deposition. And they come back and say, well, this super nanny show reflects on her leadership and her maturity and all those kinds of things. Every bit of it, according to the transcendent report, it's all rooted in her views about corporal punishment. And, you know, y'all go look at it. We have the references to the video of the super nanny show. We have the references to the video of the BC board. The BC board, in fact, and according to Dr. Clarkson's declaration, adopted not only John White's recommendation, but the reasons for his recommendation. And that was what caused the denial of the application. Look at these things and I'm sure you'll, well, I believe you will conclude that this was a violation. It was causal. And this was viewpoint discrimination. And there shouldn't be any qualified immunity for viewpoint discrimination, as this court held in the Chow case many, many years ago. And they talk about what John White said in his deposition and what he didn't say in his deposition. Well, remember, Your Honor, this is only a motion for summary judgment. And we have the good sound precedent of Reeves v. Sanderson Plumbing Company that says you don't just take what the defendant says and assume it's gospel on a motion for summary judgment. The court has to view the evidence of the light most favorable to the non-movement. And viewing this evidence of the light most favorable to the non-movement, I believe, totally and completely substantiates our case. Excuse me for my not being able to speak so good this afternoon. That's all right. Thank you, Mr. Smith. Thank you very much. Last case for today, Cleveland v. MidAmerica.